Rosemary M. Rivas (State Bar No. 209147)
Email: rrivas@zlk.com
Quentin A. Roberts (State Bar No. 306687)
Email: qroberts@zlk.com
**LEVI & KORSINSKY, LLP**
44 Montgomery Street, Suite 650
San Francisco, California 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

Counsel for Plaintiffs Romeo James Alba,
Dajana Spasojevic, Derek Beachum,
and Marc Katz

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROMEO JAMES ALBA; DAJANA SPASOJEVIC; DEREK BEACHUM; and MARC KATZ; on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BAYERISCHE MOTOREN WERKE AG; BMW NORTH AMERICA, LLC; VOLKSWAGEN AG; VOLKSWAGEN GROUP OF AMERICA, INC.; AUDI AG; AUDI OF AMERICA, INC.; AUDI OF AMERICA, LLC; DR. ING. H.C.F. PORSCHE AG; PORSCHE CARS OF NORTH AMERICA, INC.; BENTLEY MOTORS LIMITED; DAIMLER AG; MERCEDES-BENZ USA, LLC; MERCEDES-BENZ VANS, LLC; MERCEDES-BENZ-U.S. INTERNATIONAL; ROBERT BOSCH GMBH; and ROBERT BOSCH LLC, <br><br> Defendants. | Case No. 3:17-cv-05025 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Romeo James Alba, Dajana Spasojevic, Derek Beachum, and Marc Katz (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to allegations regarding themselves, and on the investigation of their counsel and information and belief as to all other allegations:

## NATURE OF ACTION

1.      This is a class action seeking damages, injunctive relief, and other relief pursuant to federal and state antitrust laws and consumer protection laws from Defendants Volkswagen AG, Volkswagen Group of America, Inc. (together, "Volkswagen"), Audi AG, Audi of America Inc., Audi of America, LLC (together, "Audi"), Dr. Ing. H.c.F. Porsche AG, Porsche Cars of North America, Inc. (together, "Porsche"), Bentley Motors Limited ("Bentley"), Daimler AG ("Daimler"), Mercedes Benz USA, LLC, Mercedes-Benz U.S. International, Inc., Mercedes-Benz Vans LLC (together, "Mercedes-Benz"), Bayerische Motoren Werke AG, BMW North America, LLC (together, "BMW"), Robert Bosch GmbH and Robert Bosch LLC (together "Bosch") (collectively, "Defendants"), arising from their unlawful conspiracy spanning approximately two decades to curb competition among one another, stifle technological and mechanical innovation, and illegally inflate prices at the expense of consumers and the environment.

2.      Defendants make up Germany's most important industry—the manufacturers of luxury automobiles.  Car enthusiasts around the world await new releases from Defendants, expecting the newest technology and innovation.  This is premised on the longstanding notion that Mercedes-Benz, Porsche, Audi, BMW, and Bentley all vigorously compete with one another to develop, produce, and sell the best passenger automobiles.  As such, owners and lessees of these vehicles pay considerable premiums in order to obtain what have been historically recognized as top of the line vehicles.

3.      Recent news, however, shows that Defendants have not been competing with another to provide cutting edge cars to consumers.  In fact, evidence from multiple reputable sources indicates that since at least the mid-1990s, Defendants have acted as an illegal cartel for the purpose of limiting the pace of technological advances, eliminating competition among one another, and inflating prices paid by consumers.

4.      Defendants and their unnamed agents and co-conspirators have shared commercially

sensitive information with one another for the purpose of reaching unlawful agreements surrounding the development, production, and sale of their vehicles, covering technological and mechanical components, suppliers, costs, and the market.

5. The European Commission ("EC") confirmed on July 22, 2017, that it is investigating Defendants, along with the Bundeskartellamt, Germany's Federal Cartel Office (the "Cartel Office"), for violating European antitrust laws. Reliable German news media has provided that in the last five years alone, the conspiracy transpired through at least 60 working groups, 1,000 meetings, and involved over 200 employees, including at the management and board level.

6. Additionally, both Daimler, which controls its Mercedes-Benz subsidiaries, and Volkswagen, which controls its Audi, Porsche, and Bentley subsidiaries, have independently admitted to participating in illegal coordination with Defendants with the hopes of receiving leniency from the EC and Cartel Office. Specifically, Daimler reportedly began cooperating with the authorities in as early as 2014. Volkswagen's voluntary admission was dated July 4, 2016, where it confirmed its "participation in suspected cartel infringements" to the EC. Thus, the anticompetitive behavior complained of herein is indisputable.

7. As a result of this unlawful and deceptive coordination by Defendants, Plaintiffs paid inflated prices for the cars manufactured by Defendants (collectively, "German Premium Cars") from at least 1990 through the present (the "Class Period"). Moreover, Defendants' unlawful collusion substantially affected interstate trade and commerce in the United States and caused antitrust injury to Plaintiffs and other owners and lessees of the German Premium Cars. Plaintiffs seek to represent all persons and entities in the United States who purchased or leased German Premium Cars during the Class Period which were manufactured or sold by Defendants.

## JURISDICTION AND VENUE

8. Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to recover equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). The Court has original federal question jurisdiction over the Sherman Act claim asserted in this Complaint pursuant to 28 U.S.C. § 1331 and Section 16 of the Clayton Act.

9. Plaintiffs also assert claims for actual and exemplary damages pursuant to state

antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution, recover damages, and secure other relief against Defendants for violations of those state laws.  The Court has jurisdiction over these claims under 28 U.S.C. § 1337.

10.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

11.     This Court has personal jurisdiction over Defendants, either directly or through the ownership or control of their United States subsidiaries because they transacted substantial business in the United States, including in this District, and directly or indirectly sold or marketed substantial quantities of German Premium Cars in the United States, including in this District, and conspired to and did mislead consumers in the United States and in this District.  Additionally, the illegal antitrust conspiracy was directed at, and had a substantial and reasonably foreseeable effect of causing injury to entities and persons in the United States, including in this District.  Defendants have also purposefully availed themselves of the laws of the United States.

## PARTIES

**PLAINTIFFS**

12.     Plaintiff Romeo James Alba is a California resident who purchased a 2010 diesel Audi A3 TDI in 2010 from the Auto Gallery in Woodland Hills, CA.  Plaintiff Alba was injured by paying an unlawfully inflated price due to Defendants' collusion as described herein.

13.     Plaintiff Derek Beachum is a New Jersey resident who leased a 2016 BMW 535i xDrive M Sport from BMW of Cape Cod, MA.  Plaintiff Beachum also leased a 2016 BMW 328i xDrive from BMW of Mount Laurel, NJ.  Plaintiff Beachum was injured by paying unlawfully inflated prices due to Defendants' collusion as described herein.

14.     Plaintiff Dajana Spasojevic is an Illinois resident who in the last ten years has purchased a variety of Defendants' affected vehicles, including a 2017 Porsche Panamera Turbo from

Napleton Porsche in Westmont, IL and a 2013 Bentley Continental GT from Perillo Downers Grove in Downers Grove, IL.  Plaintiff Spasojevic was injured by paying unlawfully inflated prices due to Defendants' collusion as described herein.

15.     Plaintiff Marc Katz is a New York resident who leased a 2016 BMW X6 from Life Quality Motor Sales in Brooklyn, NY.  Plaintiff Katz was injured by paying unlawfully inflated prices due to Defendants' collusion as described herein.

**DEFENDANTS**

### The Volkswagen Defendants

16.     Defendant Volkswagen AG is a German corporation with its principal place of business in Wolfsburg, Germany.  Volkswagen AG is the parent company of Volkswagen Group of America, Inc., Audi AG, Porsche AG, and Bentley.  In 2016, Volkswagen AG was the largest auto manufacturer in the world.  Volkswagen AG's revenues for 2016 were over $217 billion dollars.

17.     Defendant Volkswagen Group of America, Inc. is incorporated in New Jersey, does business in all fifty states and the District of Columbia, and has its principal place of business in Herndon, Virginia.  Volkswagen Group of America, Inc. advertises, markets, and sells Volkswagen vehicles throughout the United States, including in this District, during the Class Period.

### The Audi Defendants

18.     Defendant Audi AG is a German corporation with its principal place of business in Ingolstadt, Germany.  Audi AG is the parent company of Audi of America, Inc. and Audi of America, LLC and also is a wholly owned subsidiary of Volkswagen AG.  Audi AG designs, develops, manufactures, and sells the German Premium Cars at issue that were purchased throughout the United States, including this District, during the Class Period.  Audi AG directs the activities of its subsidiaries which act as its agents selling German Premium Cars throughout the United States.

19.     Defendant Audi of America, Inc. is incorporated in New Jersey, does business in all fifty states and the District of Columbia, and has its principal place of business in Herndon, Virginia.

20.     Defendant Audi of America, LLC is incorporated in Delaware, does business in all fifty states and the District of Columbia, and has its principal place of business in Herndon, Virginia.

CLASS ACTION COMPLAINT

**The Porsche Defendants**

21.     Defendant Dr. Ing. h.c. F. Porsche AG is a German corporation with its principal place of business located in Stuttgart, Germany.  Porsche AG is a wholly-owned subsidiary of Volkswagen AG.  Porsche AG designs, develops, manufactures, and sells the German Premium Cars at issue that were purchased throughout the United States, including this District, during the Class Period.

22.     Defendant Porsche Cars North America, Inc. is incorporated in Delaware with its principal place of business in Georgia.  Porsche Cars North America, Inc. is a wholly-owned United States subsidiary of Porsche AG and advertises, markets, and sells German Luxury Vehicles in all fifty states.  Porsche Cars North America, Inc. maintains a network of 189 dealers throughout the United States.

**Bentley**

23.     Bentley Motors Limited Company is organized under the laws of the United Kingdom. Bentley has been a subsidiary of Volkswagen AG since 1998.  Bentley's United States headquarters are in the offices of Volkswagen Group of America in Herndon, Virginia.

**Daimler**

24.     Defendant Daimler Aktiengesellschaft is a foreign corporation headquartered in Stuttgart, Baden-Württemberg, Germany.  Daimler designs, engineers, manufactures, tests, markets, supplies, sells, and distributes the German Premium Cars at issue that were purchased throughout the United States, including in this District, during the Class Period.  Daimler is the parent company of Mercedez-Benz USA, LLC and controls this subsidiary which acts as the sole distributor for Mercedes-Benz vehicles in the United States.  Daimler owns 100% of the capital share in Mercedes-Benz USA, LLC.

**The Mercedes-Benz Defendants**

25.     Defendant Mercedes-Benz USA, LLC is a Delaware limited liability corporation with its principal place of business in Atlanta, Georgia.  Mercedes-Benz USA, LLC operates a regional sales office, a parts distribution center, and a customer service center in New Jersey.  Mercedes-Benz designs, manufactures, markets, distributes, and sells the German Premium Cars at issue that were purchased throughout the United States, including this District, during the Class Period.

26.     Defendant Mercedes-Benz U.S. International, Inc. is a corporation organized and existing under the laws of Alabama, with its principal place of business in Vance, Alabama. Mercedes-Benz U.S. International, Inc. is a wholly-owned subsidiary of Daimler AG.

27.     Defendant Mercedes-Benz Vans, LLC is a Delaware limited liability corporation with its principal place of business in Ladson, South Carolina.  Mercedes-Benz Vans, LLC is a wholly owned U.S. subsidiary of Daimler AG.

**The BMW Defendants**

28.     Defendant Bayerische Motoren Werke AG is a German holding company and vehicle manufacturer.  Bayerische Motoren Werke AG is headquartered in Germany.  Bayerische Motoren Werke AG, together with its subsidiaries, develops, manufactures, and sells cars and motorcycles worldwide, including the German Premium Cars at issue that were purchased throughout the United States, including in this District, during the Class Period.

29.     Defendant BMW North America, LLC is a Delaware limited liability corporation with its principal place of business in Woodcliff Lake, New Jersey.  BMW of North America, LLC is the United States importer of BMW vehicles.

**The Bosch Defendants**

30.     Robert Bosch GmbH is a German limited liability company with its principal place of business in Gerlingen, Germany and is the parent company of Robert Bosch LLC.  Robert Bosch GmbH directs the activities of its subsidiaries and with Robert Bosch LLC, designs, manufactures, develops, and supplies automotive technology and parts, including those provided to the Defendants for use in German Premium Cars, such as for use in those vehicles' diesel emissions systems, among others.

31.     Robert Bosch LLC is a Delaware limited liability company with its principal place of business in Farmington Hills, Michigan.  Robert Bosch LLC is a wholly owned subsidiary of Robert Bosch GmbH, and designs, manufactures, develops, and supplies automotive technology and parts, including as provided to Defendants for use in German Premium Cars, such as for use in those vehicles' diesel emissions systems, among others.

1   **AGENTS AND CO-CONSPIRATORS**

2        **Unnamed Agents and Co-Conspirators**

3        32.    Unnamed persons or companies have participated within or in furtherance of the cartel.

4   These unnamed agents and co-conspirators performed acts or made statements in violation of

5   applicable antitrust laws and consumer protection laws as alleged herein and thus are jointly and

6   severally liable for their acts of their co-conspirators regardless of being named as a Defendant in this

7   Class Action Complaint.

8        33.    Each Defendant acted as the agent or joint venturer of or for other Defendants with

9   respect to the acts, violations, and common course of conduct alleged by Plaintiffs.

10                                      **FACTUAL ALLEGATIONS**

11   **CARTEL BEHAVIOR AND THE ADMISSIONS**

12        34.    In the public's eye, Defendants are aggressive competitors trying to outdo one another,

13   sometimes even outwardly criticizing the others' cars.  For example, at the major car shows in Paris,

14   Frankfurt, Geneva, Tokyo, and Detroit, Defendants' executives or top developers disparaged the other

15   Defendants' new releases.  Although the representatives are typically quoted anonymously, *Der*

16   *Spiegel*, a widely respected and circulated German magazine, reported that a BMW developer

17   commented on a new Audi model stating, "It already looks as old as its predecessor," and a Mercedes-

18   Benz representative commented on a Volkswagen model stating, "You're better off buying a Skoda.

19   It's 3,000 cheaper and a better car."  This competition is merely for appearances, however.

20        35.    Governmental investigations in both Europe and the United States in conjunction with

21   reporting by *Der Spiegel* have confirmed that the competition between Defendants is largely a fiction.

22   The reality is that for years, Defendants often did not compete with one another, but instead secretly,

23   and very closely, cooperated with one another, as if they worked at the same company.  The media has

24   exposed Defendants' illegal coordination, dating it back to at least the 1990s, and covering their

25   emissions systems, costs, suppliers, markets, and mechanical components.

26        36.    Even more noteworthy, however, are Defendants' independent admissions, which

27   solidify that they have illegally acted as a cartel in violation of applicable antitrust law.  Daimler

28   (Mercedes-Benz), Volkswagen, Audi, and Porsche have admitted this much to the EC and the Cartel

Office in an attempt to receive leniency because of their cooperation.

37.     According to research conducted by *Süddeutsche Zeitung*, the largest German subscription daily newspaper, along with several broadcasters, Daimler was the first of the Defendants to secretly admit to participating in the illegal cartel to the European authorities, and did so "significantly earlier" than Volkswagen.  This was done without the other Defendants knowing, and specifically so it could avoid a fine, potentially in the billions of Euros.  Under European law, the first cooperating co-conspirator in an antitrust matter may avoid punishment.  One report published by *Süddeutsche Zeitung* stated that Daimler may have been cooperating with authorities as early as 2014.  Moreover, this notion of Daimler stepping away from the Cartel was corroborated by *Der Spiegel*, which reportedly saw meeting minutes from one of Defendants' meetings, confirming that Daimler was removing itself from the meetings with the other Defendants.  Specifically, *Der Spiegel* reported that the particular meeting minutes complained of Daimler's non-participation stating, "Daimler's attendance of the exhaust treatment working group meetings continues to leave something to be desired."

38.     Furthermore, in a brief dated July 4, 2016, Volkswagen provided a voluntary declaration of its "participation in suspected cartel infringements" to the European anti-cartel authorities.  According to Volkswagen's statement, it, Daimler, BMW, Audi, and Porsche have coordinated with one another regarding the development of their vehicles, costs, suppliers, and markets since at least the 1990s and at least through 2016 when the brief was submitted.

39.     Volkswagen's admission provides a glimpse into the illegal behavior that has spanned two decades or more.  According to *Der Spiegel* and other German news media, top engineers and developers from Volkswagen, Daimler, BMW, Audi, and Porsche were divided by their specialties and met "regularly several times a year" in Stuttgart, Munich, Ingolstadt, and Wolfsburg, and at the major auto shows in Geneva, Frankfurt, and Paris.  The experts from each of the Defendants were separated into working groups and sub-working groups, according to the specific areas they worked in, such as "engine," "car body," "chassis," "electric/electronic," and "total vehicle."  Further reports state that the sub-working groups were much more specialized, including braking control systems, seating systems, air suspensions, clutches, and notably—diesel engines.

40.     The working group meetings between Defendants' engineers and managers were systemic and recurring.  In fact, according to Volkswagen's admission, there were more than 60 working groups that Defendants participated in and more than 1,000 meetings in the last five years alone.  Moreover, these meetings and related communications took place in person, on conference calls, and over email.  *Der Spiegel* reported that one Audi email read, "Hello everyone, here is the information on the 'secret' meeting in Munich."

**EVIDENCE AND EFFECTS OF DEFENDANTS' COLLUSION**

41.     The results of the collusion among the members of the cartel suspended competition relating to various segments of the German luxury car industry.  It also ensured that consumers were not receiving the top of the line technology or engineering in their cars, something that Defendants led them to believe, particularly so that Defendants could justify charging the luxury price premiums on the German Premium Cars.

**Diesel Technology**

42.     It is also apparent that it was the various illegal agreements made between Defendants that prevented diesel emissions technology from being effective at reducing emissions as it could have been.  Specifically, these agreements led to "Dieselgate," Volkswagen's massive fraud on consumers and regulators around the world regarding its "clean diesel" cars, including its diesel Audi and Porsche models, and the level of pollutants they emitted.

43.     Volkswagen pleaded guilty to installing "defeat devices" in its diesel cars to cheat regulations and has since had to pay more than $20 billion in consumer and governmental restitution and penalties in the United States alone.[1]  Moreover, Bosch supplied the software in the diesel Volkswagen, Audi, and Porsche models that contained the "defeat devices."  While Bosch did not admit liability, it did agree to pay $327.5 million to settle the diesel claims.  Now it is known that this massive injury to consumers and the environment was originated through cartel agreements.

44.     In the 2000s due to the rising awareness of climate change, the auto industry faced pressure from consumers and regulators to reduce the level of carbon dioxide emissions from cars.

---

[1]  *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, & Prods. Liab. Litig.*, No. 15-md-2672, pending in the Northern District of California.

Rather than exploring electric engines or hybrid engines, Defendants looked to diesel.  While diesel engines release less carbon dioxide than traditional gasoline engines, they do emit a different pollutant, nitrous oxide ("NOx").  Lawmakers, however, restricted the levels of NOx and thus, for Defendants to sell their diesel German Premium Cars in the United States, an emissions reduction system was needed.

45.     Defendants developed an emissions reduction system to lower the NOx pollutants emitted by their German Premium Cars.  This was done by using a tank, typically located close to the trunk, which injected a mixture of chemicals in the exhaust stream in order to lower the NOx concentration from the diesel exhaust (generally referred to as "AdBlue tank").  The AdBlue tank would allow the diesel German Premium Cars to remain compliant with applicable emissions laws.

46.     During the inception of this system, Defendants used differently sized AdBlue tanks in their respective diesel models.  However, according to *Der Spiegel*, Defendants met in Sindelfingen on April 5, 2006, and agreed to coordinate on and limit the size of the AdBlue tanks they would use.  There, Defendants' representatives determined that by coordinating their AdBlue tanks and restricting the size, they could save 80 Euros per car.

47.     In September 2008, Daimler, Audi, VW, and BMW unlawfully agreed to limit the AdBlue tanks to 8-liters reasoning that it would be lightweight, cheaper, and left room for golf bags in the trunk.  Moreover, in June 2010, Defendants unlawfully agreed to keep the 8-liter tank as the standard size in Europe while using a 16-liter tank in the United States.  This was agreed upon knowing that it was too small to accommodate the emissions standards of the United States.  In fact, Audi wrote in a document shared among the Defendants that "a minimum tank volume of 19 liters" was needed at average AdBlue consumption to meet the requirements.  Daimler, VW, and BMW concurred, and yet all stuck with the 16-liter tank size.

48.     While it was technically impossible to have a 16-liter AdBlue tank and comply with United States emissions regulations, it was fraudulently achieved through the use of VW's "defeat

device" which was installed in in the diesel VW, Audi, and Porsche models.[2]  The "defeat device" software allowed the car to sense when it was being testing for emissions which would trigger the engine to behave differently and emit less pollutants, thereby deceiving regulators.  On the road, the vehicles were emitting pollutants at highly illegal levels.

49.   Defendants knew that the coordination on AdBlue tank size was illegal.  This was "repeatedly recognized" by those managers within the diesel engine group.  One email by a VW manager regarding the emissions systems strategy communicated that Daimler "had its legal advisors examine the issue" and that "[t]he law firm that was hired expressed considerable concerns that problems could arise if a competitor did in fact file a complaint."

50.   Additionally, in a September 2011 working group presentation regarding diesel emissions systems, the last two pages concerning the development of a special sensor were removed.  This was done pursuant to an email from a Daimler representative which stated, "[a] review of the document with the legal department led to serious concerns in terms of cartel law."  Thus, Defendants consciously knew that their behavior was in violation of antitrust laws and yet they simply tried to conceal it and move forward.

51.   This illegal coordination on AdBlue tank size materially injured consumers as it unlawfully inflated the price of the diesel German Premium Cars. Owners and lessees were deceived into believing Defendants competed with each other to offer vehicles with superior emissions control systems that were compliant with applicable regulations.  Moreover, Defendants deceived owners and lessees into believing a price premium for such vehicles was warranted.  This was not true.

52.   Unlawful agreements concerning the diesel emissions systems of Defendants' vehicles is only one example stemming from the illegal cartel behavior since the 1990s.  Defendants' collusion affected all aspects of their automobile design, production, and sales.

**Convertible Top Technology**

53.   Another example of the effects of Defendants' collusion is reflected in their convertible

---

[2]  There is currently litigation pending against Daimler related to emissions cheating in its diesel vehicles. *See Lynevych v. Mercedes-Benz USA, LLC*, No. 2:16-cv-00881-JLL-JAD, pending in the District of New Jersey.

top technology.  Illegal coordination on the mechanics behind their convertible tops has been confirmed through meeting minutes and shows a clear example of both the stifling of innovation and the stifling of competition among the Defendants.

54.     In a "working group for mechanical attachments," experts from each of the Defendants collectively decided they would continue to use the current convertible top mechanism that allows a soft top to be opened and closed at speeds up to 50 kilometers per hour (approximately 30 miles per hour).

55.     Instead of competing with one another for the technical advantage and superior performance within the realm of convertible tops, minutes from a meeting that took place in Bad Kissengen state that there would be "[n]o arms race when it comes to speeds."  Further, Defendants arguments that went against an arms race, which were memorialized in the minutes, included "costs, weight, increasing technological risk and crash relevance."

56.     Thus, the result of these secret meetings was that convertible top models by Defendants can only be opened and closed at speeds up to 50 kilometers per hour/approximately 30 miles per hour.  This is not because of a technological or engineering barrier, but rather because of illegal coordination among Defendants in order to save on costs and suspend competition.

**DEFENDANTS' HISTORY OF ANTICOMPETITIVE CONDUCT**

57.     Defendants are no strangers to anticompetitive and illegal behavior.  As noted above, Volkswagen has paid over $20 billion to United States consumers and regulators in restitution and penalties associated with its scheme to cheat diesel emissions with the "defeat devices."  Bosch paid $327.5 million to settle the United States claims.

58.     In 2016, the EC fined European truck manufacturers $3.2 billion, including Daimler and Volkswagen's subsidiary, MAN, for participating in a conspiracy to price fix their trucks.  The manufacturers paid record fines except for Volkswagen's MAN because it was the first to admit to the conspiracy to the European authorities.

59.     In June 2016, the Cartel Office conducted investigations into Defendants' operations for collusion related to steel pricing.

**TOLLING THE STATUTE OF LIMITATIONS**

60.      Plaintiffs and members of the Classes had no actual or constructive knowledge of the collusion alleged herein or facts sufficient to put them on inquiry notice until, at the earliest, July 21, 2017, when *Der Spiegel* exposed Defendants' cartel behavior.  Before that, Plaintiffs and members of the Classes did not know that they paid artificially inflated prices for the German Premium Cars.

61.      Before the publication by *Der Spiegel*, there was no public information indicating that Defendants had been engaging in illegal coordination since the 1990s on costs, suppliers, emissions, markets, and mechanical components.  Plaintiffs and members of the Classes reasonably believed it to be a competitive industry.

62.      Plaintiffs exercised reasonable diligence in bringing their claims.  Plaintiffs and the members of the Classes could not have discovered the alleged conspiracy before July 21, 2017, by the exercise of reasonable diligence because of the affirmative acts of Defendants and the unnamed agents and co-conspirators to conceal the wrongful behavior.  Additionally, Defendants affirmatively deceived the public into believing they competed with one another.  As reported by *Der Spiegel*, Daimler Chief Executive Officer ("CEO") Dieter Zetsche commented on Germany's luxury market by stating that "as neighbors, we are constantly stepping on each other's toes.  In this sense, competition is an incredibly good thing."  BMW CEO Harald Krüger said, "This competition constantly motivates us to achieve excellence," while Audi CEO Rupert Stadler said that competition had "given us all a technological advantage."  Through Defendants secrecy and affirmative deception, the collusion was kept out of the public eye for more than twenty years until recently.

63.      As such, no statute of limitations bars Plaintiffs' and the Classes' claims.

**THE GERMAN PREMIUM CAR MARKET'S CHARACTERISTICS SUPPORT THE EXISTENCE OF THE CONSPIRACY**

64.      The following characteristics of the German Premium Car market in the United States support the existence of the conspiracy: (i) high barriers to entry; (ii) high concentration of manufacturers; (iii) inelasticity of demand; and (iv) opportunities to conspire.

**HIGH BARRIERS TO ENTRY**

65.      Where there is a conspiracy that lowers costs for manufacturers and increases the price

for consumers, market forces typically attract new entrants seeking to exploit the pricing gap created by that conspiracy's supracompetitive pricing. However, where there are high barriers to entry in an industry, new manufacturers/competitors outside the conspiracy are less likely to enter the market. So, barriers to entry are a key component to facilitating the formation and continuation of a price-fixing conspiracy.

66.     In the German Premium Car market there are high barriers that preclude, reduce, or make it more difficult for new players to enter the market. A new entrant into the business faces the existence of economies of scale and faces costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and longstanding customer relationships and brand preferences.

**HIGH CONCENTRATION OF MANUFACTURERS**

67.     A highly concentrated market facilitates and fosters collusion because participants are better able to coordinate on issues and increase their gains from collusion. Further, the automobile industry is one of the most highly concentrated industries in the world.

68.     Defendants have exclusively controlled and dominated the German Premium Car market in the United States throughout the Class Period.

69.     Volkswagen owns Audi, Porsche, and Bentley and in 2016 was the largest vehicle manufacturer in the world. In 2016, Volkswagen reported €105.651 billion in revenue for its Volkswagen passenger car division, €59.317 billion for its Audi division, €22.318 billion for its Porsche division, and €2 billion for its Bentley division.

70.     In 2016, BMW reported €86.424 billion in revenue for its automotive division, which is comprised of BMW, Mini, and Rolls-Royce vehicle sales. BMW vehicles comprised the majority of those sales, with over 80%.

71.     In 2016, Daimler reported €89.284 billion in revenue for its Mercedes-Benz Cars division, which is largely comprised of German Premium Cars.

72.     In 2017, BMW, Audi, and Mercedes-Benz accounted for 80% of the global luxury car market.

**INELASTICITY OF DEMAND**

73.     A successful price-fixing conspiracy requires a demand which must be relatively inelastic at competitive prices.  If not, increased prices will result in declining sales, revenues, and profits, because customers will purchase substitute products or stop buying altogether.  Inelastic demand, therefore, is a market characteristic that facilitates collusion, by allowing producers to raise their prices without triggering customer substitution and loss of sales revenue.

74.     Demand for German Premium Cars is highly inelastic as there are no close substitutes for such vehicles.  In particular, purchasers of these vehicles are attracted to the German engineering aspect in conjunction with the premium vehicle.  These characteristics are only found among Defendants' brands, whose market shares have risen while United States brands and Volvo have seen their shares decrease.

**OPPORTUNITIES TO CONSPIRE**

75.     As explained herein, Defendants and their agents and co-conspirators, have systematically conspired since at least the 1990s.  Indeed, Volkswagen's admission suggested there have been more than 1,000 meetings in the last five years alone, spanning over 60 different working groups.  These illegal meetings and communications have reportedly taken place at Defendants' corporate offices, auto-shows, industry events, over email, and during conference calls.

76.     Moreover, these communications and meetings were patently improper, kept secret from the public, and in furtherance of the conspiracy.

## CLASS ALLEGATIONS

77.     Plaintiffs Spasojevic, Beachum, and Katz bring this action on behalf of themselves and as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure for the following class ("**Nationwide Premium Class**"):

> All persons and entities who, during the Class Period, purchased or leased a German Premium Car with a gas engine in the United States, not for resale, which was manufactured or sold by a Defendant, any current or former subsidiary of a Defendant or any co-conspirator of Defendants.

78.     Plaintiff Alba brings this action on behalf of himself and as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure for the following class ("**Diesel Premium Class**"):

> All persons and entities who, during the Class Period, purchased or leased a German Premium Car with a diesel engine in the United States, not for resale, which was manufactured or sold by a Defendant, any current or former subsidiary of a Defendant or any co-conspirator of the Defendants.

79.     The Nationwide Premium Class and the Diesel Premium Class are referred to as the "Classes" throughout this Complaint.  Plaintiffs reserve the right to redefine the Classes, including by proposing multi-state Classes, prior to class certification after having the opportunity to conduct discovery.

80.     Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased the vehicles at issue directly or for resale.

81.     <u>Numerosity</u>. Fed. R. Civ. P. 23(a)(1).  The members of the Classes are so numerous that joinder is impractical.  The Classes consist of hundreds of thousands of members, the precise number which is within the knowledge of and can be ascertained with Defendants' records and/or the Department of Motor Vehicle records.

82.     <u>Commonality</u>. Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are numerous questions of law and fact common to members of the Classes, which predominate over any questions affecting only individual members of the Classes.  Among the questions of law and fact common to the Class are:

a.  Whether Defendants and their agents and co-conspirators engaged in a scheme to raise, fix, maintain, and/or stabilize prices of German Premium Cars sold in the United States with gas engines;

b.  Whether Defendants and their agents and co-conspirators engaged in a scheme to raise, fix, maintain, and/or stabilize prices of German Premium Cars sold in the United States with diesel engines;

c. The identity of the participants of the alleged conspiracy and their roles in implementing the scheme;

d. The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

e. Whether Defendants' alleged conspiracy violated Section 1 of the Sherman Act and state antitrust laws;

f. Whether Defendants' alleged conspiracy violated state consumer protection laws;

g. Whether the conduct of Defendants and their co-conspirators, as alleged herein, caused injury to Plaintiffs;

h. Whether Plaintiffs and members of the Classes overpaid for German Premium Cars sold in the United States during the Class Period as compared to other comparable automobiles of similar size and performance;

i. Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Classes;

j. The appropriate injunctive and related equitable relief; and

k. The appropriate class-wide measure of damages for the Classes.

83.     Typicality. Fed. R. Civ. P. 23(a)(3).  Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Like all members of the Classes, Plaintiffs paid inflated premiums for German Premium Cars.

84.     Adequacy. Fed. R. Civ. P. 23(a)(4).  Plaintiffs will fairly and adequately represent and protect the interests of the Classes.  Plaintiffs' interests do not conflict with the interests of the Classes.  Plaintiffs have retained counsel competent and experienced in prosecuting complex class action.  Accordingly, neither Plaintiffs nor their counsel have interests that conflict with the interests of the members of the Classes.  Thus, the interests of the Classes will be fairly and adequately protected.

85.     Superiority of Class Action. Fed. R. Civ. P. 23(b)(3).  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual

difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by each of the Plaintiffs and the members of the Classes are relatively small compared to the burden and expense that would be required to litigate these issues on an individual basis.

86.     The prosecution of separate actions by members of the Classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. Additionally, individual actions may be dispositive of the interests of the Classes, although certain class members are not parties to such actions.

87.     Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2).  The conduct of Defendants is generally applicable to the Classes as a whole and Plaintiffs seek equitable remedies with respect to the Classes as a whole.  As such, the systematic policies and practices of Defendants make declaratory or equitable relief with respect to the Classes as a whole appropriate.

## CAUSES OF ACTION

### COUNT I

### VIOLATION OF SECTION I OF THE SHERMAN ACT, 15 U.S.C. § 1

88.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.  This claim is brought on behalf of the Classes.

89.     During the Class Period, Defendants and their co-conspirators engaged in a continuing agreement, contract, combination, and conspiracy to artificially inflate, raise, maintain, and/or stabilize the prices of German Premium Cars within the United States, its territories, and the District of Columbia in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

90.     The agreement, contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among the Defendants and their coconspirators in furtherance of which Defendants and their co-conspirators fixed, raised, maintained, and/or stabilized prices for German Premium Cars sold in the United States.  Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws.

91.     Among other things, Defendants conspired and agreed to reduce, stifle, or eliminate

competition for technological innovation and improvements with respect to emissions systems, suspension, electronic systems, transmissions, propulsion systems, and braking systems, in addition to other components and systems.  As a result of this conspiracy, the prices paid by Plaintiffs and the Classes for German Premium Cars were artificially inflated.

92.     As a result of Defendants' agreements, contracts, combination, or conspiracy alleged herein, the competition in the market for German Premium Cars has been reduced or eliminated.

93.     As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Classes have been injured and will continue to be injured in their businesses or property in that they paid more for a German Premium Car than they otherwise would have if it was a competitive market.

94.     As a result of the foregoing, Plaintiffs and the Classes are entitled to injunctive relief in order to stop the violations alleged herein.

## COUNT II

### VIOLATIONS OF STATE ANTITRUST LAWS

95.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.  This claim is brought on behalf of the Classes.

96.     During the Class Period, Defendants and their co-conspirators engaged in a continuing agreement, contract, combination, and conspiracy to artificially inflate, raise, maintain, and/or stabilize the prices of German Premium Cars within the United States, its territories, and the District of Columbia in violation of state antitrust laws as set forth below.

97.     The agreement, contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among the Defendants and their co-conspirators in furtherance of which Defendants and their co-conspirators fixed, raised, maintained, and/or stabilized prices for German Premium Cars sold in the United States.  Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws.

98.     Among other things, Defendants conspired and agreed to reduce, stifle, or eliminate competition for technological innovation and improvements with respect to emissions systems,

suspension, electronic systems, transmissions, propulsion systems, and braking systems, in addition to other components and systems. As a result of this conspiracy, the prices paid by Plaintiffs and the Classes for German Premium Cars were artificially inflated.

99.     As a result of Defendants' agreement, contract, combination, or conspiracy alleged herein, the competition in the market for German Premium Cars has been reduced or eliminated.

100.     As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Classes have been injured and will continue to be injured in their businesses or property in that they paid more for a German Premium Car than they otherwise would have if it was a competitive market.

**CALIFORNIA**

101.     As alleged herein, the fact that competition for German Premium Cars was restrained, suppressed, and/or eliminated throughout California due to Defendants' conduct of entering into agreements in restraint of trade is in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*

**ILLINOIS**

102.     As alleged herein, the fact that competition for German Premium Cars was restrained, suppressed, and/or eliminated throughout Illinois due to Defendants' conduct of entering into agreements in restraint of trade is in violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. §§ 10/1, *et seq.*

**NEW YORK**

103.     As alleged herein, the fact that competition for German Premium Cars was restrained, suppressed, and/or eliminated throughout New York due to Defendants' conduct of entering into agreements in restraint of trade is in violation of N.Y. Gen. Bus. Law §§ 340, *et seq.*[3]

104.     As a result of the foregoing, Plaintiffs and the Classes seek damages and multiple damages as permitted by law for their injuries by Defendants' violations of the aforementioned statutes.

---

[3]  In compliance with N.Y. Gen. Bus. Law § 340.5, Plaintiffs provided notice of this complaint to the New York Attorney General.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT III

## VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

105.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.  This claim is brought on behalf of the Classes.

106.    During the Class Period, Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair trade practices as set forth below.

107.    The affirmative acts of Defendants, including acts in furtherance of the conspiracy, were wrongfully and fraudulently concealed by Defendants and carried out in a manner that precluded detection, including public statements regarding competition by Defendants' executives and top leadership positions.

108.    As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Classes have been injured and will continue to be injured in their businesses or property in that they paid more for a German Premium Car than they otherwise would have if it was a competitive market.

**CALIFORNIA**

109.    As alleged herein, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*

**ILLINOIS**

110.    As alleged herein, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Illinois' Consumer Fraud and Business Practices Act, 815 Ill. Comp. Stat. §§ 505/1, *et seq.*

**NEW JERSEY**

111.    As alleged herein, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. §§ 56:8-1, *et seq.*

**NEW YORK**

112.   As alleged herein, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law §§ 349, *et seq*.

113.   As a result of the foregoing, Plaintiffs and the Classes seek relief as permitted, including damages, injunctive relief, and costs of the suit, including reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and members of the Classes demand judgment against Defendants as follows:

A.   That the Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Classes;

B.   That the Court adjudge and decree that the contract, combination, and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act and state antitrust laws;

C.   That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiffs and the Classes;

D.   That the Court award Plaintiffs and the Classes treble damages;

E.   That the Court award Plaintiffs and the Classes attorneys' and experts' fees and costs as well as pre-judgment and post-judgment interest as permitted by law; and

F.   That the Court award Plaintiffs and the Classes such other and further relief as may be deemed necessary and appropriate.

/ / /

/ / /

1

## **JURY DEMAND**

Pursuant to Federal Rules Civil Procedure 38(c), Plaintiffs demand a trial by jury on all matters so triable.


Dated: August 29, 2017                              **LEVI & KORSINSKY, LLP**

                                                By:   */s/ Rosemary M. Rivas*
                                                        Rosemary M. Rivas

                                                Quentin A. Roberts
                                                44 Montgomery Street, Suite 650
                                                San Francisco, CA 94104
                                                Telephone: (415) 291-2420
                                                Facsimile: (415) 484-1294

                                                Counsel for Plaintiffs Romeo James Alba,
                                                Dajana Spasojevic, Derek Beachum,
                                                and Marc Katz

CLASS ACTION COMPLAINT